# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

NO. 03-19-00661-CV
NO. 03-19-00662-CV

---

**A. J. R., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY
NO. C-19-0001-CPS & NO. 19-0003-CPS,
THE HONORABLE GARY L. BANKS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A.J.R. ("Amanda")[1] appeals from a district court's orders terminating her parental rights to two children, arguing that the evidence is neither legally nor factually sufficient to support the district court's statutory-predicate and best-interest findings. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (b)(2). We will affirm the orders.

### GENERAL BACKGROUND

As relevant to this appeal, Amanda has three children: Emma, Hayden, and Ethan.[2] Emma was born May of 2015. The Department of Family and Protective Services first began

---

[1] We will use pseudonyms to refer to the mother, her boyfriends, the children, and the foster family. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

[2] The facts set forth in the background section are based on undisputed aspects of the record. Amanda's rights to Ethan are not at issue in this case.

investigating Emma's safety in October of 2017 upon a report of possible child neglect and abuse. At the time, two-year-old Emma was living with Amanda and Amanda's boyfriend, Jeff. Although Jeff is not Emma's father, Amanda described herself, Jeff, and Emma as a family "unit," and Amanda was several months pregnant with his child at the time the investigation commenced. Department investigator Tina Fernandez visited Amanda's apartment on October 26, 2017, and learned: Amanda was suffering complications from the pregnancy; Amanda had recently received inpatient care at a nearby mental-health facility; Emma had stayed with Amanda's mother during the inpatient treatment; Jeff had a history of substance abuse and was often "strung out" on methamphetamines; Emma had a visible injury to her head but was otherwise healthy; Jeff and Amanda had conflicting stories as to how Emma sustained her head injury; and Emma had sustained a previous injury—a fractured femur—while in the care of Amanda's former boyfriend, Arturo.

Amanda declined to let Fernandez into her apartment, describing it as "not clean," but agreed to a Safety Plan that required Amanda to find a safe and stable place to stay with Emma. When Amanda failed to identify a suitable alternate residence after several attempts, the Department filed a petition for conservatorship, obtained an order for protection of a child in an emergency, and then removed Emma from the home in November of 2017.

The Department assigned Katie Wahrmund to serve as case worker, and she and Amanda agreed to a Service Plan that outlined the steps Amanda would need to take to regain custody of Emma. The Service Plan required Amanda to: participate in a psychological evaluation and a substance abuse assessment; submit to random drug testing; undergo counseling "to address the concerns that led to the removal"; enroll in parenting classes; stay in monthly contact with the Department; maintain "a safe / stable home environment free of drugs / alcohol use, domestic

2

violence[,] and criminal activity"; allow announced and unannounced visits to the home; obtain and maintain a legal source of income; notify the Department of any changes in residence, relationship, or employment within a few days of the change; and engage in visits with Emma as arranged by the Department. The ultimate goal, at that point in time, was family reunification.

Hayden was born on January 3, 2018, while Emma was in foster care. Amanda identified Jeff as Hayden's father, and Jeff does not deny paternity. Amanda tested positive for marijuana at her first pre-natal visit, but all subsequent tests came back negative for illegal substances. Upon Hayden's delivery, hospital staff transferred him to the neo-natal intensive care unit due to multiple concerns about his health. Hayden remained hospitalized throughout January. Meanwhile, the Department filed a petition for temporary protection and conservatorship. The district court issued an order for protection of a child in an emergency on January 23, 2018, and case workers removed Hayden from Amanda's custody upon his discharge from the hospital. The court later appointed Dori Wegner to serve as special advocate on behalf of Emma and Hayden.

At some point in 2018, while Emma and Hayden were in foster care, Amanda learned she was expecting again. After eviction from her apartment for failure to pay rent, Amanda moved to Oklahoma in November and obtained employment with a hotel whose owners allowed her to live onsite in an apartment assigned to her immediate supervisor, Charles. Amanda gave birth to Ethan in January of 2019, and upon discharge she and Ethan began living with Charles in his apartment. Three months later, authorities for the State of Oklahoma opened an investigation into Ethan's welfare. The case workers in Oklahoma ultimately closed the matter after interviewing Amanda and Charles, reviewing notes from the Department's investigation in Texas, briefly removing Ethan from Amanda's care, and ultimately concluding that reports of

3

possible neglect were "unsubstantiated." Although she lived and worked in Oklahoma, Amanda maintained some contact with Wahrmund and would travel to Texas approximately every other week for visitation with Emma and Hayden.

## TERMINATION HEARING

The Department tried the two petitions[3] for termination of parental rights to the bench over three days in April, May, and June, 2019. Witnesses included:

- Mindy Young, the foster mother for Emma and Hayden;

- Tina Fernandez, the Department's investigator;

- Katie Wahrmund, the Department's case worker;

- Charles, Amanda's supervisor and roommate in Oklahoma;

- Melissa Phillips, a welfare specialist for the State of Oklahoma;

- Dori Wegner, the court-appointed special advocate assigned to the case; and

- Amanda as Respondent.

**Mindy Young**

At the time of her testimony, Young and her husband were providing foster care for both Emma and Hayden. She testified that Emma is happy and healthy and "doing well" but described Emma's increasing confusion as to her circumstances:

> She's having a lot of issues differentiating between who people are in her life. She's very confused. She's been moved a few times. She still has trouble understanding her relationship with [Amanda], her relationship with me, her relationship with her previous foster mother. She's just very confused.

---

[3] The Department filed separate petitions for Emma and Hayden. Those petitions also sought the termination of the respective fathers' parental rights, which are not at issue on appeal.

She explained that she planned to seek pediatric counseling to help Emma work through these issues. She added that Emma is "very bonded" to Hayden.

Young described caring for Hayden as extremely demanding due to his extensive medical needs. As she understands it, Hayden's developmental delays and birth defects were caused by a combination of genetic anomalies and intra-uterine drug exposure.[4] She testified that he requires a specialized diet and the care of seven different physicians, plus weekly appointments for physical therapy, occupational therapy, and speech therapy. She indicated that she hopes to adopt Emma and Hayden but that doing so will require her to stay at home full time due to "all his needs," including recovery from multiple anticipated surgeries. She said she and her husband have made a "joint decision" to have her "tak[e] time off away from [her] career" to manage Hayden's care. She then described a robust support network she and her husband would rely on as needed to attend to Hayden's needs.

**Tina Fernandez**

Fernandez offered testimony summarizing her investigation into Emma's case. She recounted her original visit to the home and what she learned that day. She testified that because of Jeff's history of drug use and because of her concerns about Emma's recent head injury and the broken bone that Emma had sustained while in the care of a prior boyfriend, Fernandez and Amanda developed the Safety Plan whereby Amanda would find a suitable residence for herself and Emma. They initially agreed that she would stay with a friend and that Amanda would notify Fernandez of any change in residential status. Amanda, however, did not abide by this

---

[4] The court allowed the testimony regarding possible pre-natal drug exposure as evidence of the foster mother's understanding of Hayden's medical needs but not as evidence of the possible exposure itself.

5

Safety Plan, leaving the designated residence after allegedly observing substance abuse on site. She then stayed with various friends and family members and ultimately moved back into the apartment with Jeff without notifying Fernandez. Upon locating Amanda, Fernandez obtained a written admission that Jeff had used marijuana and methamphetamines within the week. She also learned that Amanda had tested positive for marijuana during a recent pre-natal screening (i.e., early in her pregnancy with Hayden). Fernandez explained that in researching possible family placement for Emma, every candidate had a history of violence or substance abuse. She ultimately concluded that Amanda "did not have any family that was safe for her or [Emma] to stay with." At that point, the Department removed Emma from the home and placed her with a foster family.

**Katie Wahrmund**

Wahrmund offered testimony on her experiences and impressions as the case worker assigned to Emma and Hayden's respective cases. She described an incident in March of 2018 in which Amanda missed a scheduled family group conference because she had overslept. Repeated phone calls to Amanda went unanswered, and several hours passed before Amanda finally contacted the Department to explain why she had missed the conference. Wahrmund testified that Amanda's service providers had reported similar problems with absenteeism due to oversleeping. She described multiple occasions on which she attempted to arrange a visit to the home but received no answer or was told Amanda would need more time to get ready. By May of 2018, the Department changed its ultimate goal from "family reunification" to "termination and adoption."

6

According to Wahrmund, the Department's increased emphasis on the possibility of termination did not improve Amanda's progress toward her goals or increase her compliance with Service Plan requirements. Wahrmund described an incident in September of 2018 in which Wahrmund and Wegner, the court-appointed special advocate, attempted an unannounced visit to Amanda's apartment. Amanda was around four or five months pregnant with Hayden at this point. Wahrmund and Wegner knocked for thirty minutes without any answer. The apartment manager ultimately intervened and allowed maintenance staff to enter the apartment, where staff found Amanda in a deep sleep in the middle of the day. After she awoke, Amanda agreed to let Wahrmund and Wegner into the apartment. Wahrmund provided photos of the unsanitary and unsafe conditions she saw in the apartment that day, including one photo that she testified appears to show marijuana and paraphernalia.[5] Other photos show food, garbage, and laundry strewn on nearly every surface of the apartment. Wahrmund described a strong smell of marijuana and cigarette smoke, and Wegner described the overall scene as "deplorable."

Wahrmund described a later incident in which Amanda's brother and his girlfriend had an altercation involving a firearm at Amanda's apartment, leading law enforcement to enter the apartment to investigate reports of a domestic dispute. She described Amanda's brother as emotionally unstable and described the brother and his "on-again–off-again girlfriend" as relatively frequent visitors to Amanda's apartment. Wahrmund was concerned when she learned that the investigator in Oklahoma had encountered similar police reports and general resistance

---

[5] Wahrmund explained that Amanda's drug tests had all "c[o]me back negative on her" and surmised that the drugs and paraphernalia likely belonged to Amanda's brother or another houseguest. She described Amanda's frequent hosting of drug users as a "pattern of behavior" throughout the case.

7

to visits by welfare officials. She testified that she did not believe Amanda is able to maintain "a safe and stable home."

When asked to comment on Amanda's ability to care for Hayden, Wahrmund expressed skepticism that Amanda "understands, medically, all of the needs that [Hayden] has." She doubted that Amanda could adequately address those needs without owning a vehicle while working full time and caring for Hayden's two siblings. She observed that even during visitation, Amanda struggled to attend to both Emma and Hayden, and that Hayden typically remained largely ignored while Amanda played with Emma. She expressed concern that Amanda had occasionally denied that Hayden will need surgery when multiple specialists have indicated a need for several procedures. Wahrmund was also concerned that, when asked what Hayden needs most, Amanda responded, "[L]ots and lots of love."

Wahrmund was then asked to assess Amanda's compliance with her court-ordered Service Plan. Wahrmund testified that Amanda failed to comply in multiple respects:

> She ha[s] not notified the Department within five days of new relationships or moving. She has not successfully completed parenting classes and demonstrated what she's learned with interactions with her children. She was unable to complete random drug tests once she moved [to Oklahoma]. And we were not given monthly information from service providers as far as wh[ether] actual counseling was discussing and talking about the reasons for removal and the concerns.

She concluded that Amanda had not "substantially complied with the [S]ervice [P]lan."

**Charles**

Charles testified that he and Amanda became friends a few years ago when he lived in San Angelo before moving to Oklahoma. When he heard that she needed a job and a place to stay, he invited her to move to Woodward, Oklahoma, where she could live at a hotel if she

8

agreed to work the front desk full time. He denied that she moved to Oklahoma to avoid having the new baby removed by Texas authorities upon delivery. He explained that Amanda does not own a vehicle and that he takes her wherever she needs to go, including to Texas for visitation with Emma and Hayden. He testified that she was seeking out as many counseling and parenting services as she could in Oklahoma in hopes of regaining custody of her two older children. When asked how she would live in a hotel room with three children, Charles responded that the owners of the hotel planned to offer her one of their rental homes if she regains custody of Emma and Hayden. Charles testified that Amanda dotes on Ethan frequently and has never missed a visitation with Emma or Hayden, but he conceded that Amanda has essentially no social network, other than himself, in or near Woodward, Oklahoma. He mentioned that Amanda had said multiple times that she might move back to Texas.

The Department elicited testimony involving an incident that occurred shortly before trial. Charles's sister had apparently called 911 and reported that Charles was suicidal, in possession of a firearm, and threatening to "blow his head off." Police officers arrived at the hotel and transported Charles to the hospital, where he was held for observation and then discharged. Charles denies that he ever threatened to harm himself or others, although he concedes that he owns a firearm. He characterized his sister as a liar who fabricated the threat of suicide due to family "issues" between them. The district court sustained Charles's and Amanda's objections to admission of the police report of the incident but allowed Charles to describe what had transpired.

9

**Melissa Phillips**

Melissa Phillips is the welfare worker who investigated allegations that Ethan might be suffering neglect at the hotel in Oklahoma. She testified that her investigation included interviews with Amanda, Charles, and Ethan's pediatrician. She also reviewed Amanda's medical history and certain records from Emma's and Hayden's respective cases pending in Texas. She testified that Ethan was removed from Amanda for one week due to concerns about Amanda's mental health and her frequent trips to Texas (i.e., to visit Emma and Hayden). She then explained, "Once I received more information, we did not have any concerns."

When asked whether the residence in Oklahoma was safe for Emma and Hayden, she replied that she "did not have any concerns with the cleanliness or condition of the home." She continued, "It's a great set-up the way that it is, because she is able to work, and she's able to also watch the baby at the same time." She also noted that Ethan was "very clean and appeared very well taken care of." She had little concern about Amanda as a parent and said she believed it would be in Emma's and Hayden's best interest to return to their mother.

**Dori Wegner**

Dori Wegner served as the court-appointed special advocate in this matter. Counsel asked for an opinion as to whether termination of Amanda's parental rights is in the children's best interest. She replied in the affirmative.

With respect to Emma, Wegner explained:

> I believe that when Emma was with Amanda . . . there was neglectful supervision, that she was left with several different people . . . [There] was an accident back in August of 2017. I think she broke her leg. Also, the accident that happened to Emma where she fell off the slide and hit her head. . . . When I spoke with Amanda's mother, she said she would keep Emma [for Amanda] about 90% of

10

the time before she was removed. . . . I don't believe that Amanda's addressed her mental health issues.

She concluded, "In my opinion, parental rights should be terminated for Amanda for Emma due to neglectful supervision."

With respect to Hayden, Wegner explained:

He has several medical conditions, as Mrs. [Young] testified. He is going to need extreme care, probably for the rest of his life. . . . After going to several of the doctor visits and [hearing] them explaining to me several conditions that he might have or will have, I think he needs that excessive expert care that they can provide if rights are terminated. . . . I do not see Amanda being able to take care of these children's needs.

When asked to comment on the State of Oklahoma's investigation into Amanda's care of Ethan and whether those authorities were "wrong" in their conclusions about Amanda as a parent, Wegner declined to comment on that case.

**Amanda**

Amanda testified that she had an "on and off" relationship with Jeff while Emma was in her custody and acknowledged his pattern of drug use and "partying." She admitted to using marijuana herself, including when she was pregnant with Hayden, but denied that she had ever been "diagnosed with any kind of drug problem." She referred to the cleanliness of her apartment as "not okay" when Fernandez first asked to see the home but attributed its condition to the fact that she had recently been released from a mental health facility, where she had sought treatment for what she described as bipolar disorder and post-traumatic stress syndrome. She said she did not remember the condition of the apartment when Wahrmund and Wegner visited

11

but attributed her inability to maintain the apartment to pregnancy complications and work obligations.

With respect to her living arrangements in Oklahoma, she testified that she intended to return to Woodward and live in the hotel with Charles and Ethan. She conceded that Charles owns a firearm but described it as "concealed in a locked desk," and she refuted any characterization of him as unstable. She described a plan to move out of the hotel and into a house if she regains custody of Emma and Hayden. She disagreed with earlier testimony that she had no support network in Oklahoma, referring to "the girls" she works with in the hotel as "really fantastic" and "supportive of [herself] and the baby." She also testified that Charles's sister lives nearby and that her mother can drive up and stay with Amanda if needed.

With respect to Hayden and his medical needs, she testified that she is not certain "exactly what he's being treated for" but "know[s] that he has issues with his eye." She explained that she understands he will be developmentally delayed and that even though she does not have a vehicle, she can find rides to take him to specialists in Oklahoma City or Dallas. She conceded, however, that "he's doing really good [sic] with the last foster home," that he had made "great improvement" and progress in his development while with the Youngs, and that the foster mother makes "his health her priority."

With respect to Emma, Amanda agreed with Young's testimony that Emma is confused by all the people involved in her life and does not understand why she cannot live with her mother but Ethan can. When asked about Emma's placement with the Youngs, Amanda responded, "They love her like she belongs to them, and I have nothing bad to say about any of my fosters, and I appreciate them doing the job that I was not able to do."

12

**Exhibits**

The Department offered into evidence: a copy of the Department's files on Emma's and Hayden's respective cases, Wegner's final report on the case, medical records from Amanda's 2017 inpatient stay at a mental health facility, a series of correspondence between Amanda and the landlord that ultimately evicted her, a set of photos of Amanda's apartment, and an exchange of text messages indicating Amanda's unhappiness with her living arrangements at the hotel in Oklahoma. Amanda offered into evidence a set of notes and correspondence reflecting various services she had sought and obtained in Oklahoma, along with some of Ethan's medical records. Many of these exhibits simply corroborate testimony already offered by witnesses, but a few provide additional information relevant to statutory predicates and the best interest of the children.

While on the stand, Amanda testified that when Fernandez first visited her apartment in October of 2017, she had recently been discharged from inpatient treatment for bipolar depression and post-traumatic stress disorder. But her medical records reveal that Amanda originally checked herself into the facility in February of that year—when Emma was just a toddler—with complaints of "the shakes" and other symptoms of opioid withdrawal. The intake professional listed her medical history as "heavy drug use—narcotics." At intake, Amanda tested positive for amphetamines and tetrahydrocannabinol. She was discharged the following day with prescription medications and instructions on managing the withdrawal. Amanda returned to the same facility in early October, this time complaining of depression and anxiety related to her pregnancy and her troubled relationship with Jeff. During Amanda's twelve-day inpatient stay, her health-care providers noted that she had first been admitted for inpatient treatment for depression at age 14; had been in and out of care ever since; had been variously

diagnosed with clinical depression, bipolar disorder, post-traumatic stress disorder, anxiety, and attention-deficit disorder; had attempted suicide multiple times; was aware that Jeff was unemployed and using methamphetamines at their shared apartment; was having fantasies about physically assaulting Jeff or "breaking his legs" if he tried to leave her; was "overwhelmed" at the thought of having a second baby and considering adoption; and was expressing suicidal thoughts on a regular basis. She was discharged with instructions to abstain from drug and alcohol use, seek counseling, and follow-up with the clinic in two weeks.

Amanda's exhibits also provide insight into her life in Oklahoma. At the time of trial, she had attended nine parenting classes on how to care for infants. She had also attended six counseling sessions focusing on "depression, anxiety, and unresolved trauma," and was scheduled to continue attending these sessions. Ethan's medical records reflect that he was suffering a 25% delay in development but that he was up-to-date on immunizations and that Amanda had enrolled him in an early-intervention program to address the developmental delays. Amanda also submitted a social worker's proposal for additional education and counseling. None of Amanda's exhibits makes any reference to treatment for substance abuse or addiction.

After closing arguments, the district court announced that it would not rule from the bench but would "review the exhibits that were introduced in this case" and would render a decision as soon as possible. On September 24, 2019, the court issued orders terminating Amanda's parental rights to Emma and Hayden. Using identical language in each order, the court found that "termination of the parent-child relationship between [Amanda] and the child the subject of this suit is in the child's best interest." It further found that Amanda had:

14

- knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, pursuant to § 161.001(b)(1)(D), Texas Family Code;

- engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, pursuant to § 161.001(b)(1)(E), Texas Family Code;

- failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for abuse or neglect of the child, pursuant to § 161.001(b)(1)(O), Texas Family Code;

- not prove[n] by a preponderance of evidence that [Amanda]: (1) was unable to comply with specific provisions of a court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

Amanda perfected timely appeal from each order.

**DISCUSSION**

Amanda challenges the legal and factual sufficiency of the evidence to support the findings quoted above. It was the Department's burden to prove by clear and convincing evidence at least one of the predicate grounds for termination set forth in section 161.001(b)(1) of the Texas Family Code—in this case, subsection (D), (E), or (O)—and to demonstrate that termination is in the best interest of each child. *See id.* §§ 161.001(b)(1) (delineating statutory predicates), .001(b)(2) (requiring best-interest finding), 161.206(a) (requiring clear and convincing evidence); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."). Evidence is clear and convincing if it meets "that measure or degree of proof which will produce in the mind of the trier of fact a firm

belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see also* Tex. Fam. Code § 101.007 (defining "clear and convincing evidence").

To evaluate legal sufficiency of the evidence, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To evaluate factual sufficiency, we must examine all the evidence to determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d at 25; *see also In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (describing factual-sufficiency standard of review in appeals from parental termination orders and noting that appellate court "must give due deference" to fact findings and not substitute its own judgment). Evidence that is factually sufficient to support a trial court's finding necessarily satisfies the legal-sufficiency standard. *See In re M.V.G.*, 440 S.W.3d 54, 60 (Tex. App.—Waco 2010, no pet.) ("[B]ecause the evidence is factually sufficient, it is necessarily legally sufficient.").

**Statutory Predicates (D) and (E)**

Amanda contends the Department failed to meet its evidentiary burden to prove statutory predicates (D), (E), and (O). Because the provisions involve similar issues of law and fact, we will analyze subsections (D) and (E) together. And as only one statutory predicate is necessary to support termination, and because we conclude the Department met its burden with respect to subsections (D) and (E), we need not address Amanda's arguments regarding subsection (O) and the reasons for her failure to comply with court orders. *See In re A.V.*, 113 S.W.3d at 362.

16

Subsection (D) allows the termination of the rights of a parent that "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *See* Tex. Fam. Code § 161.001(b)(1)(D). Subsection (E) allows the termination of the parental rights of a parent that "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See id*. § 161.001(b)(1)(E). "Both subsections D and E of 161.001(1) use the term 'endanger.'" *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "'To endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *See id.* (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *Walker v. Texas Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). "Endangerment under subsection D may be established by evidence related to the child's environment." *Id.* "Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act." *Id.*

This record includes sufficient evidence to support the court's findings under subsections (D) and (E). With respect to Emma, the record reveals that Amanda was unable to maintain a clean and safe home and knowingly allowed the use of illegal substances within the home. Fernandez reported that at one point, everyone Amanda identified as a significant presence in her life had a history of drug abuse or violence, suggesting Emma was frequently exposed to risk of physical or emotional harm or injury. Amanda's medical records reveal a volatile, unstable situation at home, with Amanda occasionally threatening violence against Jeff, and with Jeff often "strung out" on methamphetamines or absent from the home entirely. Those same records reveal that Amanda herself was using marijuana and narcotics while Emma was just a toddler.

17

Amanda knowingly and repeatedly left Emma in the care of at least three habitual drug users—Arturo, Jeff, and Amanda's mother—with at least one of those stays resulting in significant injury and another stay lasting twelve days. This evidence would allow a reasonable factfinder to develop a firm conviction that Amanda knowingly exposed Emma to dangerous conditions, engaged in conduct that endangered her physical and emotional health, and placed her with persons that would endanger her physical and emotional health.

With respect to Hayden, Amanda argues that the Department cannot, as a matter of law, prove its (D) and (E) arguments because Hayden was at all relevant times in the Department's custody. The Supreme Court of Texas has rejected this argument by holding that a factfinder may consider circumstances and conduct that occurred before birth and after removal in evaluating (D) and (E) allegations. *See In re J.O.A*., 283 S.W.3d 336, 345–46 (Tex. 2009). In this case, Wahrmund and Wegner described the conditions of Amanda's home during her pregnancy as "deplorable." Amanda—and, as a consequence, Hayden—was frequently exposed to tobacco, marijuana, and methamphetamine smoke. Her medical records reveal that she knowingly allowed Jeff to use drugs in the apartment. She was unable to maintain a steady source of income and her relationship with Jeff was becoming increasingly volatile. Pre-natal screening confirmed that she used marijuana during at least some of the pregnancy. The Department reported that she frequently overslept and missed multiple appointments for counseling and other services intended to improve her health and the health of her unborn baby. Once the baby was born, she reportedly only visited Hayden at the NICU once per day, typically late at night, to nurse him, although she insisted on breastfeeding. Young later testified to her understanding that Hayden was significantly undernourished when he was placed with her, contributing to his developmental delays. Amanda then interrupted most of the progress toward

18

her Service Plan goals to move to Oklahoma. On this record, a factfinder could reasonably develop a firm conviction that Amanda knowingly exposed Hayden to dangerous conditions and engaged in conduct that endangered his physical and emotional health. *See id*. at 345 n.4 (collecting authorities describing endangerment resulting from exposure to substance abuse), *id*. at 346 (including pre-natal substance abuse as evidence of endangerment). The evidence is therefore both legally and factually sufficient to support the district court's conclusions with respect to Emma and Hayden under subsections (D) and (E).

**Best Interest**

Texas law recognizes a strong presumption that a child's best interest is served by remaining with his or her natural parent, *see In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied), but this record includes sufficient evidence that the Department satisfied its burden to prove termination is in the best interest of Emma and Hayden. Relevant factors in assessing the best interest of a child include: (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *accord* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is

19

controlling, and evidence presented to satisfy the predicate ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d at 27–28.

Although there is some evidence to suggest Emma has expressed a desire to return to her mother, and while it is clear that Amanda loves Emma, the remaining *Holley* factors suggest that termination is in Emma's best interest. Amanda has not shown that she can provide a stable home or consistent source of income to provide for Emma: Wahrmund testified that in the two years the Department's case was pending, Amanda had had "four, possibly five" different jobs and that she had lost count of how many different places Amanda had lived. The Youngs, meanwhile, are a well-settled family with a permanent residence and a consistent source of income.

Turning to parental ability, Amanda has recently taken parenting courses, but those classes only addressed infant care. Witnesses testified that her engagement with Emma and Hayden was not age appropriate during visitations. With respect to the risk of injury, this record suggests a reasonable likelihood that Emma would be exposed to physical and emotional harm should she return to Amanda's care: Amanda has a consistent history of associating with emotionally unstable individuals and drug users, and has repeatedly left Emma in the care of those individuals, including for twelve consecutive days with her heroin- and cocaine-addicted mother. The Youngs have expressed their desire to adopt Emma, have helped her make friends, plan to enroll her in a "Head Start" program, and will seek out pediatric counseling for any emotional issues that might result from termination. Young testified that their church members have volunteered to support the family as they care for Emma and her medically fragile brother. Taking all the evidence into account, a factfinder could form a reasonably firm conviction that

termination of Amanda's parental rights to Emma is in Emma's best interest. The evidence is therefore both legally and factually sufficient to support the district court's best-interest finding.

For many of the same reasons, the evidence is sufficient to support its conclusion with respect to Hayden's best interest. It is not clear from this record whether Hayden has expressed a custodial preference. However, Amanda, Wegner, and Young each spoke of the close bond he has with his sister, suggesting that the two would prefer to remain together. With respect to the next two factors, and as already discussed, Amanda has not shown the ability to adequately parent Emma and Hayden or to provide stability for them.

Hayden's extensive physical and emotional needs weigh heavily in favor of termination of parental rights. Nearly all the evidence reveals that Amanda struggled just to care for Emma alone. One statement in the record reveals that Amanda relied on alternate caretakers for Emma "90% of the time." The testimony of Wahrmund, Wegner, and Young reflects that Hayden is significantly developmentally delayed, has serious health issues, and will need extensive medical and personal care "probably for the rest of his life." Although Amanda testified that she can provide that care, referring vaguely to unnamed physicians in Oklahoma City or Dallas, she also conceded that she does not know what his diagnoses and prognoses are and at various times has insisted that he would grow out of the delays, that "it's not a big deal," and that he will "be just fine." This characterization of Hayden's needs is irreconcilable with Wegner's and Young's first-hand knowledge of his medical conditions and care requirements.

Young, meanwhile, has a full understanding of the extent of Hayden's delays and an appreciation of the extensive and time-consuming care he will need. Young brought to the witness stand a binder containing all of Hayden's medical records. She indicated that it is impossible to know how many surgeries Hayden will need on his back, his neck, and his eyes,

21

but testified that she will take as much time away from her career as necessary to help Hayden progress in his health and development. Even Amanda admitted that Young makes Hayden's health her first priority, thereby suggesting that permanent placement with the Youngs may be in Hayden's best interest. *See In re L.G.R.*, 498 S.W.3d at 204 (considering mother's ignorance of and inattention to child's "severe medical issues" and special needs as evidence that termination is in child's best interest).

Given Hayden's limited ability to protect himself from harm, his risk of sustaining emotional or physical injury is significant. Testimony from Fernandez, Wahrmund, Wegner, Charles, and Amanda herself all suggest that Amanda is not capable of maintaining a home safe enough for an ambulatory child as developmentally delayed as Hayden. She frequently hosts guests in possession of illegal substances or firearms. At one point drugs and paraphernalia were left exposed on the coffee table. She has repeatedly left both Emma and Ethan in the care of various unstable individuals, leading to injury in at least one case; and it is reasonable to infer that she might resort to unsuitable care for Hayden, as well. In addition, Wegner indicated in her final report to the court that Hayden could suffer irreversible long-term effects from any failure to receive the medical care he needs, and it is unclear whether Amanda will ensure he receives that care.

With respect to any programs available to assist with Hayden's needs, the record reflects that both Amanda and the Youngs have access to services. The Youngs have enrolled Hayden in early-intervention services, sought out a host of specialists to treat his conditions, and have turned to their church for additional support. Amanda submitted documents indicating that she has access to an array of social services in Oklahoma and that she is already pursuing early-intervention services for baby Ethan, suggesting she might do the same for Hayden. However,

22

she has no vehicle and no drivers' license, and it is unclear to what extent those facts would limit her ability to benefit from those programs.

With respect to the eighth factor, there is little evidence on the nature of Amanda's relationship with Hayden because of his removal at birth. And the ninth factor—any acts or omissions by the parent and any excuses therefore—weighs in favor of termination. This record reveals two primary excuses for Amanda's wrongful acts and omissions as a parent: chronic substance abuse and a long history of undertreated mental illness. While Amanda's testimony and exhibits reveal recent attempts to improve her mental health, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d at 346. Moreover, her own exhibits reveal that she is still using narcotics and are devoid of any evidence she is seeking help for her long history of substance abuse.

Taking all the evidence together, a fact-finder could form a reasonably firm conviction that termination of Amanda's rights to Hayden is in Hayden's best interest. As a consequence, the evidence is both legally and factually sufficient to support the court's finding that the Department met its burden under Section 160.001(b)(2).

## CONCLUSION

Having rejected Amanda's challenge to the orders terminating her parental rights to Emma and Hayden, we affirm those orders.

23

_____

Edward Smith, Justice

Before Justices Goodwin, Kelly, and Smith

Affirmed

Filed:   March 12, 2020